

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00257-CV

IN THE INTEREST OF K.G.,
A CHILD

------------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

## I. Introduction

In seven issues, Appellant Mother appeals the termination of her parental rights to K.G.[1] We affirm.

## II. Factual and Procedural Background

This case involves a second attempt by the Department of Family and Protective Services (DFPS) to terminate Mother's parental rights to K.G. DFPS filed its first petition to terminate Mother's parental rights to K.G. on January 14,

------------

[1] We use aliases to protect the identities of the child and her foster families. *See* Tex. R. App. P. 9.8.

2008.[2] The trial court denied the termination, appointed DFPS as K.G.'s permanent managing conservator, and signed an order dismissing the termination suit on December 17, 2008. DFPS filed its second petition to terminate Mother's parental rights to K.G. on June 26, 2009. The second trial—the one from which Mother now appeals—occurred in May 2010.[3]

K.G. was around eight years old when DFPS filed its first petition, and DFPS's plan for K.G. was for her to be adopted by the McDougals, her foster family at that time. At the May 2010 trial, DFPS offered some testimony pertaining to events prior to the 2008 petition, including that Child Protective Services (CPS) had received a referral in December 2007 about negligent supervision of K.G. by Mother and that Mother had had prior involvement with CPS because of concerns about her drug use and her tendency to disappear.[4] Kimberly Russell, a CPS investigator, testified that in December 2007, Mother admitted that she had been smoking marijuana since age fourteen and that she had a history of selling crack cocaine, although she told Russell that she had stopped selling crack cocaine in July 2007. Russell informed Mother that she

---

[2]DFPS alleged the following grounds for termination in its first petition: endangerment, execution of an unrevoked or irrevocable affidavit of relinquishment of parental rights, prior termination of parental rights to another child based on endangerment, and constructive abandonment. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (K), (M), (N) (West 2008).

[3]Father's parental rights to K.G. were also terminated, but he does not appeal.

[4]CPS lost contact with Mother from July 2007 to December 2007.

would have to take a hair follicle drug test or K.G. would remain apart from Mother, but Mother did not take the drug test. Mother was verbally belligerent and made threats throughout the investigation. On January 8, 2008, Mother spoke with Russell by phone and asked about her other two children but not about K.G.[5] Russell's involvement in the CPS investigation ended January 16, 2008, after concluding that the CPS referral of neglectful supervision of K.G. was "unable to determine."

On December 17, 2008, the trial court denied DFPS's first petition—although Mother had not completed most of the services listed on her CPS service plan[6]—and ordered Mother to pay $100 per month in child support, to have reasonable visitation with K.G., to complete a hair follicle drug test by January 2, 2009, and to complete a psychological evaluation. The trial court found in its order that appointment of K.G.'s parents as her managing conservators would not be in K.G.'s best interest because "the appointment would significantly impair the Child's physical health or emotional development."

---

[5]Mother's other two children had been voluntarily placed with fictive kin—the same ones K.G. was living with at the time. By December 12, 2007, the CPS case involving the other children had been closed.

[6]Mother's February 2008 service plan required her to submit to random drug tests at CPS's request, participate in individual counseling and anger management classes, complete a drug assessment, participate in supervised visits with K.G., and participate in parenting classes. Mother completed her drug assessment in 2008.

3

In addition to a fictive kin voluntary placement, K.G. had lived in three or four foster homes by May 2010. Cindy Lopez, K.G.'s therapist; Russell; Ashley Moore, the ongoing CPS caseworker; and Shirley Morris, K.G.'s foster mother at the time, testified at the second trial, in addition to K.G. testifying in camera.

In camera, K.G. told the trial court that she was in fourth grade and had lived with Shirley for about five months. K.G. stated, "I want to be adopted because I'm tired of moving around, going from place to place." She told the trial court that Mother had had a long time to get her back and stated, "[Mother] had one chance that all she had to do was get her—I'm sorry—take her classes over again, but she didn't, so I feel like she really doesn't care." K.G. said, "No matter how hard she cries or sorry, to say sorry, I really don't care any more for her, so I want to be adopted."[7] K.G. informed the trial court that she had lived apart from Mother for four or five years and that she had not seen Mother recently.

Moore, the ongoing CPS caseworker, testified that Mother did not take the court-ordered hair follicle drug test by January 2, 2009, but that Mother took a hair follicle drug test on January 9, 2009. The next time Mother complied with a CPS request to take a hair follicle drug test was June 2, 2009.

---

[7]K.G.'s therapist testified that she met K.G. in November 2008. K.G. was acting out in school with suicidal and homicidal thoughts and ideations because of trouble coping with the separation from her family. She worked with K.G. for around thirteen months ending in December 2009. By December 2009, prior to her pre-adoptive placement, K.G. "had reached a point to where she knew what she wanted and she knew how to move forward." By April 2009, K.G. had decided that she wanted to be adopted.

4

Mother completed her psychological evaluation, admitted as Exhibit 8, and gave the following information in the January 29, 2009 evaluation: Mother was twenty-six years old, had three children, and her then-two-year-old daughter was born with marijuana in her system. Mother started using marijuana when she was seventeen, she attended outpatient drug treatment in 2007 but failed to complete it because of lack of transportation, and the last time she used marijuana was in December 2008. She denied ever using cocaine or ever having suicidal ideation. However, she had thought seriously about hurting others, and when CPS became involved in her life, she occasionally heard voices telling her to hurt CPS. She tried to fight one of her CPS caseworkers once and the police had come to her house "plenty of times."

Mother made the following statements to the examiner: "I wanted to kill them [the last time she was in court], they told me I can't be around nobody's kids, I wanted to break the persecutor's [sic] throat"; and "I be blacking out half of the time, I don't need medication, I have been counting to calm my nerves." Testing during the evaluation revealed that Mother was in the borderline range of intellectual functioning and had difficulty learning, with poor insight about her mental health issues; additional diagnosis classified Mother with schizoaffective disorder, bipolar type, and cannabis dependence. Mother took some classes

through "Positive Influences" based on recommendations in the psychological evaluation, but she did not seek help for her mental health issues.[8]

Moore admitted that Mother had paid child support and that Mother had attended visits with K.G. from February to September 2009. However, in September 2009, Mother attended only one of three possible visits. Mother did not attend any visits in October or November 2009, and Moore was unable to reestablish contact with Mother until December 2009. Mother had visits with K.G. on December 28, 2009, and January 28, 2010, but after January 28, 2010, Mother did not attend any visits with K.G.[9]

Moore testified that there had been a period of time when Mother had kept in regular contact with her but then Mother started going months between phone contacts with her.[10] Moore testified that Mother's phone numbers were "typically disconnected"[11] and that when she went to Mother's last known address in October 2009, she was informed that Mother no longer resided there. Mother

---

[8]Mother told Moore in 2009 that she went to John Peter Smith hospital once but left without being seen because the wait was very long.

[9]Mother told Moore that she had not been attending visits because of her schedule with her job and her community service. Mother did not take advantage of Moore's offer to schedule visits after Mother finished work, and Mother was either unable or unwilling to make other arrangements for the visits.

[10]Moore said that this was similar to Mother's previous cases "when she would disappear for months on end."

[11]Mother had provided Moore with over twenty-five phone numbers during the last year and a half before the 2010 trial, and she occasionally gave Moore other people's phone numbers when she did not have a phone.

told Moore, when Moore asked her where she had been living over the last few months, that she had been "drifting from friends and family members" and that she "drifts from place to place." Moore said that the last time she saw Mother was at the January 28, 2010 visit with K.G.

Moore testified that after the 2008 trial, she asked Mother to complete additional services, including parenting classes, anger management classes, individual counseling, and a drug assessment. She said that she did this as part of CPS's obligation to attempt to reunify the family and so that Mother could show the trial court that she had mitigated the circumstances that led to K.G.'s removal. Mother completed the parenting classes but complied with only two of fourteen CPS-requested drug tests, even though Moore told Mother that failure to take a drug test would result in a presumption that the test would have been positive.

Moore testified that she sent a letter to Mother on April 28, 2009, outlining additional recommended services, and on May 14, 2009, Mother acknowledged to Moore that she received the letter. Moore admitted during cross-examination that nothing in her letter to Mother about the additional services stated that failure to perform them would have an impact on whether K.G. was returned to her. She also acknowledged that Mother was not under a court order to take the other drug tests Moore requested and that Mother had done a drug assessment in 2008. Moore admitted that CPS never made a finding of physical abuse of K.G. by Mother and that CPS removed K.G. from Mother based on the risk of neglect.

7

Moore urged Mother to seek mental health treatment based on Mother's erratic behavior and exhibition of different personalities,[12] although Mother's drug issues were Moore's main concern. Moore allowed K.G. to pick the places for her visits with Mother so that Mother and K.G. could have good visits. She provided payments for drug testing, counseling, and anger management and parenting classes, and she provided bus passes, all to help Mother complete her services. Moore stated that the services were offered to Mother in the hope that K.G. could be reunited with her and that "whether [Mother] believes me or not, I really, truly wanted to reunify her."[13]

Based on Mother's failure to complete services, CPS decided in May 2009 to file a second petition to terminate Mother's parental rights to K.G.; in June 2009, it filed the petition, alleging the following grounds: execution of an unrevoked or irrevocable affidavit of relinquishment of parental rights; termination of parental rights to another child based on an endangerment finding; failure to

---

[12]Moore testified that Mother would curse her out one week and then two weeks later be very friendly. With regard to Mother's behavior and attitude during the pendency of the CPS case, Moore stated, "Well, she just called me a bitch, she's been very, very rude, very unprofessional, in my opinion; did not exhibit behaviors of someone who wants her child back. . . . Cursing, storming out of the courtroom, being very disrespectful to the professionals in this building."

[13]Moore stated that home studies were not conducted on the two placements Mother suggested because one of the possible guardians had criminal history as recent as 2009 and the other had multiple children in the home already and the CPS worker for that home had recommended no placement.

support K.G. in accordance with Mother's ability during a period of one year ending within six months of the date of filing the petition; failure to comply with the provisions of a court order that specifically established the actions necessary to obtain K.G.'s return; and constructive abandonment. *See* Tex. Fam. Code Ann. § 161.001(1)(F), (K), (M), (N), (O). However, Moore admitted that, as of May 2009, Mother had not constructively abandoned K.G. She also admitted that immediately after the first termination trial, CPS's plan for K.G. was still for an unrelated adoption with a concurrent plan of relative adoption.

Moore replied, "Yes," when asked whether, at the beginning of the case, K.G. was bonded with and loved Mother and when asked if, over time, she had seen a significant change in these circumstances. She stated that CPS's plan for K.G. was termination of Mother's parental rights followed by adoption by K.G.'s foster mother, Shirley. Moore served Mother with DFPS's new petition on January 6, 2010.

Moore testified that Mother's housing instability, her failure to alter her pattern of behavior, and her lack of parenting skills would endanger K.G. if K.G. were returned to her. Moore also testified that CPS still had concerns that Mother was dealing or using illegal substances. Moore concluded that there would be physical and emotional danger to K.G. if she were returned to Mother and that it would be in K.G.'s best interest to terminate Mother's parental rights.

Shirley testified that K.G. was placed with her on December 18, 2009, and that she intended to adopt K.G. if Mother's parental rights were terminated.

9

Shirley also testified that K.G. has been diagnosed with ADHD, that K.G.'s behavior suffered when she had visits with Mother, including getting into trouble at school, and that K.G.'s behavior improved when her visits with Mother stopped.

Mother moved for a directed verdict on all of the termination grounds, and the trial court granted the directed verdict in part after DFPS waived the following grounds: execution of an unrevoked or irrevocable affidavit of relinquishment of parental rights; termination of parental rights to another child based on an endangerment finding; and failure to support K.G. in accordance with Mother's ability during a period of one year ending within six months of the date of filing the petition. *See* Tex. Fam. Code Ann. § 161.001(1)(F), (K), (M). In the order terminating Mother's parental rights, the trial court found that Mother had constructively abandoned K.G., that she had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain K.G.'s return, and that it was in K.G.'s best interest to terminate Mother's parental rights. *See id.* § 161.001(1)(N), (O), (2). This appeal followed.

### III. Termination of Parental Rights

In her first two issues, Mother argues that DFPS did not plead or prove the grounds required for termination under family code section 161.004 and that the evidence is legally and factually insufficient to show that a material change of circumstances occurred since the previous order denying termination. DFPS responds that because termination was proper under section 161.001, it was not

10

required to prove, and the trial court was not required to find, that termination was established under section 161.004.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

The trial court must find the grounds for termination by clear and convincing evidence. Tex. Fam. Code Ann. § 161.206(a) (West 2008). Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221

11

S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). But termination can only be upheld on a ground that was both pleaded by the party seeking termination and found by the trier of fact. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 194 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). The dispositive question before us is: Because DFPS sought termination of Mother's parental rights after the trial court rendered an order denying termination after the first termination trial, did DFPS have to plead and prove the grounds in section 161.004 in addition to the grounds for termination under section 161.001, and did the trial court have to make findings thereon?

## A. Statutory Construction

The fundamental guiding rule of statutory construction is to determine and give effect to the legislature's intent. *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009). Additionally, government code section 311.023 states that in construing a statute, regardless of whether it is ambiguous on its face, we may consider, among other things, the circumstances under which the statute was enacted; the statute's legislative history; and the former statutory provisions, including laws on the same or similar subjects. *See* Tex. Gov't Code Ann. § 311.023 (West 2005).

## B. Family Code Chapter 161

Family code section 161.001, used in the majority of termination cases, originated in 1907; section 161.004, originally codified as section 15.025 in 1993, is a relatively recent addition to the family code. *Compare* Act approved Apr. 5,

1907, 29th Leg., 2nd C.S., ch. LXIV, 1907 Tex. Gen. Laws 135, 135–37 (current version at Tex. Fam. Code Ann. § 161.001), *with* Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 2, 1993 Tex. Gen. Laws 2254, 2255, *amended by and recodified as* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 213–14 (current version at Tex. Fam. Code Ann. § 161.004 (West 2008)).

## 1. 1993

### a. Section 15.025 (Predecessor of Section 161.004)

Section 15.025 was added in response to the Texarkana Court of Appeals's holding that res judicata applied to an attempt to relitigate issues previously tried in a termination case. *See Slatton v. Brazoria Cnty. Protective Servs. Unit*, 804 S.W.2d 550, 552–53 (Tex. App.—Texarkana 1991, no writ); *see also In re J.H.*, No. 02-04-00031-CV, 2004 WL 2630225, at *12 (Tex. App.—Fort Worth Nov. 18, 2004, pet. denied) (mem. op.) (citing cases stating that the legislature passed section 161.004 in response to *Slatton*); *In re T.V.*, 27 S.W.3d 622, 624 n.1 (Tex. App.—Waco 2000, no pet.) ("This provision was passed in response to the concern created by the holding in *Slatton*."). In *Slatton*, notwithstanding the court's res judicata holding, because the parents had failed to raise their res judicata objection during trial, the court held that the trial court could consider the accumulation of evidence from the State's initial visit with the family in 1983 to the final trial in 1989. 804 S.W.2d at 553–56. The legislature added section 15.025 two years after *Slatton*. *See* Act of May 27, 1993, 73rd

13

Leg., R.S., ch. 597, § 2, 1993 Tex. Gen. Laws 2254, 2255 (amended and recodified 1995).

Section 15.025 states:

(a)  The court may grant a petition to terminate the parent-child relationship of a parent who is not the petitioner after an order or decree under Section 15.05(c)[14] of this code that denied a petition to terminate the parent-child relationship of that parent has been entered only if:

> (1) the petition under this section is filed after the date the order or decree under Section 15.05(c) of this code is entered; and

> (2) the court makes a finding under Subsection (b) or (c) of this section.

(b)  The court may grant a petition to terminate under Subsection (a) of this section if the court finds clear and convincing evidence that:

> (1) since the date the order or decree under Section 15.05(c) of this code was entered the parent committed an act listed under Section 15.02(a)(1) of this code; and

> (2) termination is in the best interest of the child.

(c)  The court may grant a petition to terminate under Subsection (a) of this section if the court finds clear and convincing evidence that:

> (1) the circumstances of the child, parent, sole managing conservator, possessory conservator, or another party affected by the order or decree under Section 15.05(c) of this code have materially and substantially changed since the date that order or decree was entered;

---

[14]Former section 15.05(c) is now codified as section 161.205, entitled "Order Denying Termination."  *See* Tex. Fam. Code Ann. § 161.205 (West 2008).

(2) the parent committed an act listed under Section 15.02(a)(1) of this code before the date the court's order or decree under Section 15.05(c) was entered; and

(3) termination is in the best interest of the child.

(d) At the hearing on a petition under this section, the court may consider evidence presented at a previous hearing on a petition to terminate the parent-child relationship of the parent with respect to the same child.

*Id.* Section four of the 1993 Act states that section 15.025 "applies only to a petition to terminate the parent-child relationship filed after a court order or decree [entered on or after September 1, 1993] that denied a petition to terminate the parent-child relationship." *See* Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 4, 1993 Tex. Gen. Laws 2254, 2255.

### b. Section 15.02 (Predecessor of Section 161.001)

In the 1993 amendment of section 15.02, section 161.001's predecessor, the legislature added subsection (b), which stated that a petition to terminate parental rights that is filed after the court has entered an order or decree denying a petition to terminate the same parent's rights "*may be granted only as provided by Section 15.025 of this code*." Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex. Gen. Laws 2254, 2255, *repealed by* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 2(1), 1995 Tex. Gen. Laws 113, 282 (emphasis added).

15

### c. Conclusion

At the time of section 15.025's codification in 1993, the plain language set out in sections 15.02(b) and 15.025 clearly indicated the legislature's intent that section 15.025 exclusively govern the "second petition" situation.

### 2. 1995

#### a. Recodification of Section 15.025 as Section 161.004

The 1995 and current version of section 161.004 states,

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

> (1) the petition under this section is filed after the date the order denying termination was rendered;
>
> (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;
>
> (3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and
>
> (4) termination is in the best interest of the child.

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Tex. Fam. Code Ann. § 161.004.  The legislature streamlined the language used in section 15.025 when it recodified the section as section 161.004, and it deleted the word "only" in section 15.025(a).[15]

### b.  Recodification of Section 15.02 as Section 161.001

When it codified section 15.02 as current section 161.001, the legislature omitted subsection (b) entirely, removing the language that stated that a petition to terminate parental rights that is filed after the court has entered an order or decree denying a petition to terminate the same parent's rights "*may be granted only as provided by Section 15.025 of this code*."  Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex. Gen. Laws 2254, 2255, *repealed by* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 2(1), 1995 Tex. Gen. Laws 113, 282 (emphasis added).

### c.  Conclusion

Because of the omission of the provisions that made former section 15.025 (now section 161.004) the exclusive method to terminate a parent's rights after the trial court had previously denied an order terminating the parent's rights, we must now determine whether, in the current statutory scheme pertaining to

---

[15]That is, section 15.025(a) stated that the court may grant a petition to terminate after the prior denial of a petition to terminate "*only if*: (1) the petition under this section is filed after the date the order or decree under Section 15.05(c) of this code is entered; and (2) the court makes a finding under Subsection (b) or (c) of this section."  *See* Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 2, 1993 Tex. Gen. Laws 2254, 2255 (amended and recodified 1995) (emphasis added).

involuntary termination, the legislature intended to allow the trial court the option of terminating a parent's rights under either 161.001 *or* 161.004.[16] *Cf. Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 286 (Tex. 1999) (concluding that when specific provisions of a "nonsubstantive" codification and the code as a whole "are direct, unambiguous, and cannot be reconciled with prior law, the codification rather than the prior, repealed statute must be given effect"); *In re A.L.*, No. 13-01-00388-CV, 2002 WL 34230855, at *5 n.8 (Tex. App.—Corpus Christi Aug. 22, 2002, no pet.) (not designated for publication) (noting that "if the trial court was proceeding under . . . section [161.004], TDPRS had the additional burden at trial to produce evidence documenting a 'substantial change' in circumstances subsequent to the July 19, 1999 determination that [Father's] rights not be terminated").[17]

---

[16]We have previously stated that section 161.004 allows a trial court to terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship only if section 161.004's elements are met. *J.H.*, 2004 WL 2630225, at *12. However, we made this statement in the context of addressing whether res judicata applied and whether DFPS satisfied section 161.004's requirements—the basis for its petition to terminate in that case—and not in discussing whether section 161.001 could also apply. *See id*. at *12–13.

[17]In *A.L.*, the appellant did not argue that the evidence was insufficient under section 161.004 or that the trial court erred by failing to make a specific finding that the circumstances had substantially changed. Therefore, the court did "not address the sufficiency of any possible [section] 161.004 requirements as to this case," and it found that the evidence was sufficient to support terminating the appellant's parental rights under section 161.001(1)(Q). *A.L.*, 2002 WL 34230855, at *5 n.8, 6.

### 3. Case Law Involving Current Section 161.004

Section 161.004 appears to be typically used when parents raise res judicata in a termination trial or argue that it should have been raised.[18] *See In re D.S*, 333 S.W.3d 379, 385–86 (Tex. App.—Amarillo 2011, no pet.); *M.F.*, 2010 WL 1948625, at *1–2 (applying section 161.004 in response to res judicata argument). In *D.S.*, for example, the trial court had previously denied a petition to terminate the father's parental rights, and the Amarillo Court of Appeals applied section 161.004 to defeat the father's ineffective assistance claim based on res judicata. 333 S.W.3d at 386 (stating that to show ineffective assistance, "[i]n light of the function of [section] 161.004, something beyond failure to present a res judicata defense is necessary"). But the court upheld the termination based on the father's failure to challenge the trial court's section 161.001(1)(M), (N),

---

[18]Much of the sparse case law pertaining to section 161.004 illustrates a split on whether the trial court's prior order has to be final before section 161.004 can be used. *Compare In re A.A.R.*, No. 04-08-00870, 2009 WL 1081025, at *1 (Tex. App.—San Antonio Apr. 22, 2009, no pet.) (mem. op.) (holding that section 161.004 did not apply when the trial court's earlier order did not deny termination), *Thompson v. Tex. Dep't of Fam. & Protective Servs.*, 176 S.W.3d 121, 125–28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (applying section 161.004 when trial court had previously denied termination), *overruled on other grounds, Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244 (Tex. App.—Houston [1st Dist.] 2006, no pet.), *and T.V.*, 27 S.W.3d at 624 & n.1 (holding that section 161.004 did not apply because there was no final appealable order denying termination), *with In re M.F.*, No. 11-08-00276-CV, 2010 WL 1948625, at *1–2, 4 (Tex. App.—Eastland May 13, 2010, no pet.) (mem. op.) (using section 161.004 to conclude that the trial court could consider evidence of conduct prior to the agreed final order even though it was not a previous order denying termination and upholding termination on endangerment grounds); *T.V.*, 27 S.W.3d at 624–25 (Vance, J., concurring) (disagreeing that section 161.004 applied only to final, appealable judgments).

and (Q) findings rather than on the application of section 161.004. *Id.* at 388–89; *see In re N.A.*, No. 02-10-00022-CV, 2010 WL 3834640, at *9 (Tex. App.—Fort Worth Sept. 30, 2010, no pet.) (mem. op.) (referring to section 161.004 as a trial court's alternative choice—as a postponement—between committing to termination under section 161.001 or making DFPS the child's managing conservator indefinitely).

It is unclear from the case law whether, post-recodification, section 161.004 remains the exclusive means to terminate a parent's rights after denial of a prior termination or just a means to admit evidence from a prior termination trial. *Compare In re M.P.*, No. 02-10-00064-CV, 2010 WL 5187694, at *1–2 (Tex. App.—Fort Worth Dec. 23, 2010, no pet.) (mem. op.) (noting that the trial court's termination order was based on the jury's findings under section 161.004), *In re B.L.H.*, No. 01-06-00817-CV, 2008 WL 864072, at *5–6, 11 (Tex. App.—Houston [1st Dist.] Mar. 27, 2008, no pet.) (mem. op.) (holding that the evidence was sufficient to support trial court's 161.004 findings on material and substantial change in circumstances and that termination was in the child's best interest), *J.H.*, 2004 WL 2630225, at *11–13 (holding that the evidence was factually sufficient to support jury's finding that circumstances had materially and substantially changed and stating that "[a]fter TDFPS satisfied section 161.004(a), the trial court was statutorily authorized under subsection (b) to consider all of the evidence presented at the previous termination suit"), *and In re C.T.E.*, 95 S.W.3d 462, 465 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)

20

(stating that section 161.004 was the applicable law when trial court had previously failed to terminate father's rights), *with In re N.R.T.*, 338 S.W.3d 667, 676, 678–89 (Tex. App.—Amarillo 2011, no pet.) (holding that evidence was legally and factually sufficient to support the trial court's section 161.001 findings, addressing section 161.004 in the context of res judicata, and holding that the trial court's implied findings supported termination under section 161.004), *and In re M.J.*, No. 09-05-00331-CV, 2006 WL 3438058, at *1–2 (Tex. App.—Beaumont Nov. 30, 2006, no pet.) (mem. op.) (upholding termination under section 161.001(1)(P) and (R) even though a prior termination had been denied and citing section 161.004(b) for the proposition that "[t]he court may consider evidence presented at a previous hearing in a subsequent suit for termination with respect to the same child").

Because the case law is unclear with regard to the necessity of applying section 161.004 exclusively in a termination after the prior denial of a termination, we will review the statutory scheme under chapter 161. *See* Tex. Gov't Code Ann. § 311.023; *see also Harris Cnty.*, 283 S.W.3d at 842.

### 4. Family Code Chapter 161's Statutory Scheme

Section 161.001 provides that a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that a parent has committed one of twenty listed items and that termination would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1)(A)–(T), (2).

The Austin Court of Appeals has noted that the sections that follow section 161.001

> apply to specific situations such as the rights of an alleged biological father, involuntary termination based on inability to care for the child, termination of rights after a prior denial of a petition to terminate, termination when the parent is the petitioner, termination after abortion, and termination when pregnancy results from a criminal act.

*Vallejo v. Tex. Dep't of Fam. & Protective Servs.*, 280 S.W.3d 917, 918 n.1 (Tex. App.—Austin 2009, no pet.); *see, e.g.*, Tex. Fam. Code Ann. § 161.007 (West 2008) ("Termination When Pregnancy Results from Criminal Act"); *see also Dockery v. State*, No. 03-05-00713-CV, 2006 WL 3329794, at *1 (Tex. App.—Austin Nov. 14, 2006, pet. denied) (mem. op.) (noting that the father who was seeking to terminate his rights under section 161.005—"Termination When Parent is Petitioner"—was trying to do so "under a rarely used provision of the family code").

Some of the sections that follow section 161.001, like section 161.004, have additional requirements. *Compare* Tex. Fam. Code Ann. § 161.003 (requiring a finding that the parent have a mental illness or deficiency and the resulting inability to meet the child's mental, physical, and emotional needs, in addition to a best interest finding), *with id.* § 161.004 (requiring a finding under section 161.001(1) and a best interest finding, as well as the post-denial filing and material and substantial change requirements). One has fewer. *See id.* § 161.002 (allowing summary termination of an alleged biological father's

22

parental rights without the necessity of a best interest finding if the alleged father fails to act). And one is so narrow that it has yet to be construed. *See id.* § 161.006 ("Termination After Abortion").

Chapter 161, entitled "Termination of the Parent-Child Relationship," presents an overlapping pattern: a catchall general statute, section 161.001, which covers different fact scenarios that may also include situations covered by the statutes that follow section 161.001, plus the child's best interest, and statutes created to respond to case law, such as section 161.004 in response to *Slatton*, or to potential situations, such as section 161.006. This overlapping pattern has carried over into the interpretive case law.

For example, when an alleged father admits or otherwise claims paternity, section 161.002(a) permits him to fend off summary termination of his parental rights and requires DFPS to satisfy the high burden of proof of clear and convincing evidence necessary for termination of parental rights under section 161.001. *See In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *3 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.); *see also In re D.V.*, No. 05-10-00413-CV, 2010 WL 4192892, at *6 (Tex. App.—Dallas Oct. 26, 2010, no pet.) (mem. op.) (concluding that the court did not need to reach father's section 161.002 issues when it had already concluded that the evidence was legally and factually sufficient to support termination under section 161.001); *In re D.A.*, No. 02-09-00460-CV, 2010 WL 3618718, at *1, 5 (Tex. App.—Fort Worth Sept. 16, 2010, no pet.) (mem. op.) (same).

Section 161.003 sets out a list of five elements that the court must find before it may order termination based on the parent's inability to care for a child, including a finding of a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the child's physical, emotional, and mental needs. *See* Tex. Fam. Code Ann. § 161.003(a)(1)–(5). But section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency. *See In re K.B.*, No. 02-09-00441-CV, 2010 WL 4028107, at *12 n.16 (Tex. App.—Fort Worth Oct. 14, 2010, no pet.) (mem. op.) ("Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2)."); *see also In re J.A.W.*, No. 06-09-00068-CV, 2010 WL 1236432, at *3 n.2, 4 (Tex. App.—Texarkana Apr. 1, 2010, pet. denied) (mem. op.) (holding that because the evidence was sufficient to support the trial court's section 161.001(1) finding, the court did not have to reach the other section 161.001(1) findings or the finding under 161.003); *In re A.L.M.,* 300 S.W.3d 914, 915, 931–32 & n.17 (Tex. App.—Texarkana 2009, no pet.) (refusing to modify the trial court's order to support termination under section 161.001(1)(D) or (E) when the sole basis for termination was the trial court's findings under section 161.003, which were not supported by legally sufficient evidence). *Compare In re J.P.*, No. 02-07-00026-CV, 2008 WL 283295, at *13 (Tex. App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op.) (noting that to terminate under section 161.003, DFPS "must prove additional elements

not required under section 161.001(1)(D) and (E)" and that while DFPS is not required to file a case under section 161.003, "when a parent suffers from mental illness, section 161.003 may be more appropriate"), *with In re D.R.*, No. 02-06-00146-CV, 2007 WL 174351, at *7 (Tex. App.—Fort Worth Jan. 25, 2007, no pet.) (mem. op.) ("Texas case law overwhelmingly supports TDFPS's contention that parental rights may properly be terminated under either section 161.001 or section 161.003 in cases in which a parent's mental illness or deficiency is relevant."). In *D.R.*, this court rejected the mother's argument that because she suffered from a mental deficiency, DFPS was required by statute to initiate its termination suit pursuant to section 161.003 rather than section 161.001. 2007 WL 174351, at *7 (noting that the mother cited no authority, and that this court had found none, to support her contention that termination must be brought exclusively under section 161.003 any time the parent at issue suffers from a mental deficiency).

### 5. Public Policy of the Family Code

One of the family code's overarching policies is to determine and protect the child's best interest. *See, e.g.*, Tex. Fam. Code Ann. § 263.307 (West 2008) ("Factors in Determining Best Interest of Child"); *see also In re A.S.M.*, 172 S.W.3d 710, 715 (Tex. App.—Fort Worth 2005, no pet.). With regard to conservatorship, possession, and access, for example, the family code states that Texas's public policy is that "[t]he best interest of the child shall always be the primary consideration of the court" and to assure that children will have

frequent and continuing contact with parents "who have shown the ability to act in the best interest of the child" and to provide "a safe, stable, and nonviolent environment for the child." *See* Tex. Fam. Code Ann. §§ 153.001(a)(1)–(2), 153.002 (West 2008).

## C. Analysis

Based on the legislature's omission of section 15.02(b)[19] when it codified section 161.001 and its omission of "only" in section 15.025(a) when it codified section 161.004, the interpretation of chapter 161 in the case law, and the overarching emphasis on the child's best interest interwoven throughout the family code, we cannot agree with Mother's contention that the *only* way the trial court could terminate her parental rights here was under section 161.004. *Compare* Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex. Gen. Laws 2254, 2255 (repealed 1995), *with* Tex. Fam. Code Ann. § 161.001; *see e.g., D.R.*, 2007 WL 174351, at *7 (noting that Texas case law supports contention that parental rights could be terminated under either section 161.001 or section 161.003).

Rather, using section 161.004 is the only way that the trial court could terminate her parental rights based upon "evidence presented at" the hearing before the trial court issued its December 17, 2008 denial of the first petition to terminate. *See* Tex. Fam. Code Ann. § 161.004(b). Therefore, while the trial

---

[19]Section 15.02(b), as stated above, required that termination after a prior order denying termination "may be granted only as provided by Section 15.025."

26

court erred by admitting evidence from before the December 17, 2008 denial of DFPS's first petition when DFPS did not plead section 161.004 as a ground to terminate Mother's parental rights, the error was harmless because DFPS pleaded constructive abandonment under section 161.001(1)(N), the trial court ordered the termination under section 161.001(1)(N) and (O), and, as discussed below, the evidence of constructive abandonment occurring after the dismissal order was sufficient to support termination under section 161.001(1)(N). *See E.M.N.*, 221 S.W.3d at 821. We overrule Mother's first and second issues.

## D. Constructive Abandonment

In her fifth, sixth, and seventh issues, Mother complains that termination of her parental rights under section 161.001(1)(N) cannot be upheld because DFPS failed to make a reasonable effort to return K.G. to her and because DFPS failed to provide legally and factually sufficient evidence to establish that Mother was unable to provide K.G. with a safe environment or that she had failed to regularly visit or maintain significant contact with K.G. Mother does not challenge the trial court's best interest finding.

### 1. Standard of Review

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard

27

because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire

28

record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (N) of section 161.001(1). Tex. Fam. Code Ann. § 161.001(1)(N); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 2. Applicable Law

A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of the State or an authorized agency for not less than six months,[20] (2) the State or the authorized agency has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code Ann. § 161.001(1)(N); *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *In re A.S.*, 261 S.W.3d 76, 88–89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

---

[20]Mother does not dispute that K.G. has been in foster care, under DFPS's conservatorship, for significantly longer than six months. *See* Tex. Fam. Code Ann. § 161.001(1)(N).

### a. Reasonable Efforts

In her fifth issue, Mother complains that DFPS failed to make reasonable efforts to return K.G. to her and that, despite DFPS's general statements about working on reunification, "the facts show that [DFPS's] permanency goal was termination in February[] 2009, and in May 2009, and the termination suit was filed in June[] 2009. Little if any evidence supports a position that any serious attempt to reunify K.G. with [Mother] was ever contemplated, much less put into action." She argues that performing the tasks requested by DFPS was impossible before DFPS made the decision to seek termination in May 2009.

The record reflects that DFPS's first and second petitions each contain the following language: "*If* reunification with the mother cannot be achieved, the Court should terminate the parent-child relationship . . . ." [Emphasis added.] And despite the notation in K.G.'s May 2009 service plan about unrelated adoption as the long-range permanency goal for K.G., the trial court could have reasonably formed a firm belief or conviction that the "reasonable efforts" element was proven based on Moore's testimony that she had tried to facilitate K.G. and Mother's reunification by providing services to mitigate the circumstances that had led to K.G.'s removal; that she had encouraged Mother to seek help for her mental health problems; and that she had made additional efforts to make sure that Mother and K.G. could have good visits.[21] Therefore, the trial court could

---

[21]Additionally, Mother had from May 2009 until trial in May 2010 to make her own reasonable efforts at showing the trial court that she wanted K.G. back

30

have found that DFPS, through CPS, made reasonable efforts to return K.G. to Mother. *See In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (stating that the State showed that it made reasonable efforts to return the child to the parent when it prepared service plans and made efforts to work with the parent on the service plans); *see also M.R.J.M.*, 280 S.W.3d at 505 (holding that the State made reasonable efforts under section 161.001(1)(N) when it prepared several service plans for the parent and made special arrangements for him to attend parenting classes near his home and to transport him to his psychological assessment).

### b. Safe Environment

In her sixth issue, Mother contends that DFPS provided "little more than conclusory statements regarding [Mother's] housing and ability to provide a safe environment" and that the record is "100% bare of any showing that any harm has ever happened to K.G. while she was in [Mother's] care."

The record also reflects that one of Mother's other children was born with marijuana—Mother's drug of choice since at least age seventeen—in her system; that Mother had schizoaffective disorder, bipolar type; and that Mother had not been treated for her mental health issues and instead denied that she needed medication, stating that she had been "counting to calm [her] nerves." Mother

---

in her life by working the services provided by CPS and remaining in contact with CPS. K.G. summarized her feelings about this in her in camera testimony, pointing out that all Mother had to do was take some classes again and stating, "but she didn't, so I feel like she really doesn't care."

31

had also not established a residence for K.G. by the 2010 trial; instead, she "drifted" from place to place, staying with various family and friends, and dropped out of touch with CPS for several months. Therefore, the trial court could have chosen to believe that Mother's housing instability and her failure to alter her pattern of behavior and take steps to treat her mental health issues demonstrated an inability to provide K.G. with a safe environment. *See, e.g., In re T.M.*, No. 02-09-00145-CV, 2009 WL 5184018, at *5 (Tex. App.—Fort Worth Dec. 31, 2009, pet. denied) (mem. op.) ("[T]he evidence establishes Father's inability to provide the children with *any* environment . . . much less a *safe* environment."); *M.C. v. Tex. Dep't of Fam. & Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, pet. denied) (holding that evidence was sufficient to show that mother could not provide child with a safe environment when mother, among other things, had no permanent housing, was diagnosed with bipolar disorder and depression, had anger management issues, and did not seek treatment from MHMR).

### c. Regular Visits or Significant Contact

In her seventh issue, Mother argues that the evidence is legally and factually insufficient to show that she did not regularly visit or maintain significant contact with K.G., stating that "the recent failure to maintain contact is logically explained by the timing of her receipt of the termination petition rather than a lack of desire to maintain contact."

The record shows that on January 6, 2010, Mother waived service of the second petition, which was filed in June 2009. However, Mother stopped attending visits with K.G. long before January 2010; she attended one visit in September 2009 before dropping out of contact with CPS until December 2009. And between February 2010 and the trial in May 2010, Mother did not attend any visits with K.G. Moore testified that Mother told her that she had been unable to attend visits between February and May because of her work schedule and community service, but Mother did not accept Moore's offer for an alternative visitation schedule. Therefore, the trial court could have reasonably found that Mother failed to regularly visit or maintain significant contact with K.G. *See In re J.J.O.*, 131 S.W.3d 618, 628–29 (Tex. App.—Fort Worth 2004, no pet.) (holding the evidence legally and factually sufficient to support finding that mother had not regularly visited or maintained significant contact with the child when mother made only twelve visits during a nine-month period); *see also M.C.*, 300 S.W.3d at 310 (holding that mother did not regularly visit or maintain significant contact with the child when she visited only six to eight times in a twelve-month period).

### d. Conclusion

Based on our review above, we determine that the trial court could have formed a firm belief or conviction that each of the elements under section 161.001(1)(N) were proven.[22] Therefore, we hold that the evidence is legally and

---

[22]That is, despite Moore's admission that, as of May 2009, Mother had not constructively abandoned K.G., by the time of the trial in May 2010, as set forth

factually sufficient to support termination of Mother's parental rights on the ground of constructive abandonment, and we overrule Mother's fifth, sixth, and seventh issues. *See* Tex. Fam. Code Ann. § 161.001(1)(N); *H.R.M.,* 209 S.W.3d at 108; *J.P.B.,* 180 S.W.3d at 573; *see also In re P.R.,* 994 S.W.2d 411, 416 (Tex. App.—Fort Worth 1999, pet. dism'd w.o.j.) (holding the evidence sufficient to support constructive abandonment finding when, among other things, Mother routinely missed or skipped counseling sessions, attended only two anger management classes, lived in thirteen to seventeen different locations, and failed to regularly visit or maintain significant contact with her child), *disapproved of on other grounds by J.F.C.,* 96 S.W.3d at 267. Based on our disposition here, we need not address Mother's remaining issues under section 161.001(1)(O). *See* Tex. R. App. P. 47.1.; *J.L.,* 163 S.W.3d at 84.

## IV. Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: July 28, 2011

---

above, there was sufficient evidence to support the trial court's constructive abandonment finding.