

# IN THE
# TENTH COURT OF APPEALS

### No. 10-16-00254-CV

## IN THE INTEREST OF H.L.H. AND A.H., CHILDREN

**From the 413th District Court
Johnson County, Texas
Trial Court No. DC-D201500336**

## MEMORANDUM OPINION

The trial court signed an order terminating the parental rights of H.L.H.'s father (alias Chad) and H.L.H.'s and A.H.'s mother (alias Mia) after a second termination trial.[1] A jury found that both Chad and Mia had violated Family Code subsections 161.001(b)(1)(D), (E), and (O) and that termination was in the children's best interest. Chad and Mia appeal in six and five issues, respectively. We will affirm.

### Relevant Evidence

The Department of Family and Protective Services (the Department) received the first referral regarding this family in November 2004, when Chad's and Mia's daughter

---

[1] The parental rights of A.H.'s father were terminated after the first termination trial.

H.L.H. was three years old and Mia's son A.H. was five months old. The Department was thereafter regularly involved with the family throughout the next ten years, and the trial court eventually conducted a bench trial in December 2014 on the Department's petition for termination of Chad's and Mia's parental rights. The trial court, however, signed a final order on December 20, 2014, dismissing the allegations against Chad and Mia and denying the termination of their parental rights.

Department investigator Caley Croy testified that then ten-year-old A.H. was returned to Mia from foster care at that time but that then thirteen-year-old H.L.H. was in a detention center. Chad explained that the Department had placed H.L.H. in a residential treatment center and that, while there, she had set another person's clothes on fire; H.L.H. had therefore been arrested for arson and placed in a juvenile correctional facility. Chad testified that he was also in jail when the first termination trial concluded because he had been arrested in November 2014 for missing a home visit with his parole officer.[2] Chad stated that he was then "hit" with a charge of unauthorized use of a motor vehicle but that it was subsequently dropped, and he was released. Shortly after Chad was released, he, his father (alias Ray), Mia, and A.H. picked up H.L.H. from the detention center. Mia and Ray testified that they picked up H.L.H. on January 8, 2015.

Croy testified that the Department received the next referral regarding the family on March 16, 2015. The referral involved concerns that Chad and Mia were neglectfully

---

[2] Chad had been imprisoned in 2004 when H.L.H. and A.H. were three years old and about three months old, respectively. Chad had been paroled in January 2013 when H.L.H. and A.H. were eleven and eight years old, respectively.

supervising H.L.H. and A.H. and that Chad was sexually abusing H.L.H. More specifically, the allegations were that there was domestic violence between Chad and Mia, that Chad was very controlling, and that Mia was terrified of Chad. There were also allegations that Chad was giving H.L.H. illegal substances and using illegal substances with her and that Mia had walked in on Chad touching H.L.H. in an inappropriate sexual manner. Croy stated that she attempted to make contact with the family and began by speaking with A.H. at his school. Department investigator supervisor Ninfa Torres noted that H.L.H. was not in school that day. Since returning to her parents' home, H.L.H. had been enrolled in school, but there were issues with her attending regularly. Torres said that "it was so unstable that it was hard to tell which school and when she was attending," which was an additional concern of the Department.

Croy testified that when she spoke with A.H., he first told her that he did not understand why she was there to talk to him because Ray had told him that they were done with CPS. A.H. nevertheless agreed to speak with Croy, seemed comfortable talking to her, and gave a full and complete interview. A.H. did not make any comments at that time that caused Croy concerns for his or H.L.H.'s safety. In fact, A.H. did not make any negative statements to Croy about the way that he was being treated in his home. He denied any physical violence in the home and denied seeing H.L.H. drinking alcohol or using drugs. He did not make an outcry of sexual abuse of either himself or H.L.H., and he did not ask Croy for help. A.H., however, had told school officials that his parents would engage in fistfights, and the Department got statements from those school officials. Croy said that this was concerning to the Department because when

children witness domestic violence, it affects their brain development and functioning. Children can also be injured if they attempt to get in the middle of the situation to stop the family violence.

When Chad was subsequently cross-examined about whether he had any idea why A.H. would tell school officials that there was domestic violence between him and Mia, Chad stated that he did not think that A.H. had said that. When the children's attorney ad litem further asked Chad if it would surprise him to know that A.H. had also disclosed to her that there had been domestic violence between Chad and Mia, Chad responded, "Yes, that would surprise me." Mia's attorney later questioned Chad if A.H. had been present on an occasion when Mia had been suffering a seizure that required Chad to slap her to revive her. Chad said that A.H. had been there "from a distance" and that A.H. had been about nine years old at the time. But Chad then clarified that he had not slapped Mia on that occasion. He explained that he had been standing over her, trying to keep her head from flopping back and forth, and trying to place a wallet in her mouth "to keep her from swallowing her tongue."

When Mia was cross-examined about how she would explain A.H.'s comments to school officials that there was domestic violence in the home, Mia stated that she cannot explain it. Mia testified that there was no domestic violence in the home and that Chad had never struck her in anger. H.L.H. and Ray also denied seeing any violence between Chad and Mia, both stating that they saw nothing other than some verbal arguing and yelling. Ray further testified that he never saw anything that he believed to be inappropriate between Chad and H.L.H. and that if he had seen something, he would

have stopped it and taken "whatever precautions [he] needed to."

Croy testified that after speaking with A.H. at his school, she decided to make an unannounced visit to Ray's home where Chad and Mia were residing. Croy contacted the Johnson County Task Force for assistance, and two officers, including Andrew Riggs, agreed to accompany her. Upon arriving at Ray's home, the officers asked Croy to stay in the car while they approached the residence. Ray testified that the officers came onto the porch, knocked on the door, and asked for Chad. Ray stated that Croy was standing by the car while the officers spoke with Chad and that Croy then asked Mia to come out to the vehicle, which Mia did. Croy testified that Mia seemed disoriented when she reached the vehicle and had scratches on her forehead and bruises on her arms. Croy explained to Mia that the Department had received a new referral and asked Mia how she had received the injuries to her body. Mia explained that her injuries were the result of having a seizure and falling, and she denied that there was any domestic violence or sexual abuse happening in the home.

Officer Riggs testified that at some point, H.L.H. had walked out onto the front porch. Officer Riggs acknowledged that nothing about H.L.H.'s presence or physical appearance caused him to act as a peace officer. Ray stated that Croy tried to get H.L.H. to come out to the car but that H.L.H. would not go. Croy agreed that she wanted to speak with H.L.H. that day but stated that Mia denied permission when she asked. Ray said that Croy grabbed Mia by the arm while Mia was talking to her. Ray heard Mia yelling for Croy to let her go, but Croy continued to pull Mia by the arm. According to Ray, Mia finally pulled herself away from Croy and returned to the porch. Croy, on the

other hand, said nothing about grabbing or pulling Mia's arm. Croy stated that after Mia denied her permission to speak with H.L.H., she told Mia that she had spoken with A.H. at his school. Mia "was not happy about that." Mia told Croy that they were not going to cooperate with the Department and that Croy needed to leave the property. Ray stated that he also told the officers and Croy to get off the property. Croy and the officers left the property as requested, and Officer Riggs agreed at trial that no crime was committed in his presence that day.

Croy testified that, as part of her investigation of the same referral, she called Chad's parole officer because she knew that Chad was a parolee and was being drug tested. Chad's parole officer told Croy that he had concerns that Chad was using drugs. Torres stated that she had also been extremely concerned for the children's safety when this referral had been received because the Department had received information from an "individual who has activity in the drug activity in Johnson County" that both Chad and Mia were using methamphetamine in the presence of the children. The Department therefore ultimately concluded that although it was unable to determine the physical and sexual abuse allegations, there was reason to believe that Chad and Mia were neglectfully supervising H.L.H. and A.H.

Croy testified that after speaking with Torres, she drafted an affidavit so that the Department could obtain an order to aid them in the investigation. Torres stated that the decision was made to obtain the order because Chad and Mia were being "completely uncooperative" and denying access to the children. The decision was then also made to take possession of the children, but before the Department could proceed, it was

informed that the police had possession of one of the children. Croy testified that, on March 30, 2015, she received a call from the Johnson County Task Force that officers were taking Mia and H.L.H. to the police station because a syringe of methamphetamine had been found in Mia's vehicle after Mia and H.L.H. had been stopped in the vehicle.

Officer Riggs testified that he and other officers had set up surveillance on a "known methamphetamine house and Aryan Brother[hood] hangout" in an attempt to locate an Aryan Brotherhood member who was wanted for multiple felony warrants.[3] On March 30, 2015, the officers observed Mia's van at the location. The officers then saw Mia and a man resembling the fugitive get into the van and leave the location. Officers in a marked patrol car attempted to pull over the van for a traffic stop. Mia, the driver, tried to stop the vehicle appropriately, but the man opened the passenger door and attempted to flee. It is Officer Riggs's understanding that the patrol car slid into the door of the van to try to prevent the man from fleeing, and the man was immediately apprehended. It was determined that the man was not the fugitive, but he was a known drug user and gang member. After the van was stopped, H.L.H. was also discovered in the backseat of the vehicle. Officer Riggs acknowledged that nothing about H.L.H.'s physical appearance that day caused him alarm but stated that a small amount of methamphetamine in a syringe was located under the passenger seat.

Croy testified that she went to the police station to talk to Mia and H.L.H. Chad was not there. Croy first spoke with H.L.H. alone. Even though H.L.H. was upset and

---

[3] Officer Riggs defined the Aryan Brotherhood as "a criminal gang organization that was founded in the prison system in Texas."

did not seem like she wanted to talk, Croy asked her a few questions about whether there was domestic violence in the home and whether Chad had inappropriately touched her. H.L.H. denied both.[4] H.L.H., however, did admit to Croy to recently smoking marijuana, using alcohol, and inhaling keyboard duster. Croy then met with Mia, whom she described as very erratic. According to Croy, Mia was "all over the place" while they were talking, including screaming and using a lot of hand gestures. Mia told Croy that the methamphetamine in the vehicle was not hers. Mia told Croy that she had simply agreed to give the man a ride and that he happened to have the methamphetamine in his possession.

Ray testified that he had been trying to help Chad and Mia "get on their feet" and had let them use his van. On the day that Mia was stopped, Mia had taken H.L.H. to enroll her in school. Ray explained that he, Chad, and Mia had tried to home school H.L.H. but that they had then decided to put H.L.H. back in school "when it got tough enough" that they were not sure how to advise her. When Mia and H.L.H. had arrived at the school that day, however, the school had told Mia that, to put H.L.H. back in school, Mia needed to have a certain paper signed by her and Chad and notarized. Ray stated that when the Task Force later stopped Mia with H.L.H., they rammed the van three or four times, "pretty much tearing it up." Ray said that he also "heard through different channels" that the syringe that was found in the van contained vitamin B-12. When asked

---

[4] Croy confirmed that she had referred the sexual abuse allegations to law enforcement but that, because H.L.H. did not make an outcry, a sexual abuse examination was never performed, the police investigation of the allegations stopped, and no charges were ever pursued regarding the allegations.

if he would be surprised to know that an officer testified that it was a syringe of methamphetamine, he replied, "I would be surprised." Ray testified that it is his understanding that the man in the van that day has never been charged with possession of a controlled substance.

Mia, on the other hand, testified that the man was charged with possession, but she reaffirmed that she never saw and never knew about the methamphetamine. Mia explained, "All I was doing was trying to get gas money from him to go pick up [Chad] to get our daughter back into public school because I had been home schooling her." Officer Riggs acknowledged at trial that Mia was never charged with any wrongdoing regarding the incident, never accused of possession of the drugs, and never accused of even knowing that the drugs were in the van.

Croy testified that she told Mia at the police station that the Department was nevertheless removing the children at that time. The decision had already been made by a supervisor and program director. Although Mia had not been calm during any of their conversation, Mia got more upset when she heard about the removal and began to use profanity and to hyperventilate. Croy agreed that it would have concerned her if Mia had not gotten upset that the children were going to be removed but stated that she had been concerned about Mia's behavior even before Mia learned of the removal. Croy believed that Mia might be under the influence of drugs and requested that Mia take an oral drug test. Mia refused, which further concerned Croy. Mia also began saying that she was going to have a seizure, so the paramedics were called. Mia eventually calmed down and did not go with the ambulance.

Croy testified that she then gave Mia the paperwork for the emergency removal. Croy affirmed at trial that she was concerned at that time that H.L.H.'s and A.H.'s well-being were in imminent danger because the Department had not had access to H.L.H. and had not seen inside the home, there had once again been allegations of sexual abuse and drug use, and Mia and H.L.H. had just been pulled over in a vehicle where methamphetamine was found. Croy further affirmed that she believes that Mia's action in letting H.L.H. be around a syringe of methamphetamine allowed H.L.H. to be placed in an environment that endangered her physical and emotional well-being. Likewise, Officer Riggs stated that he has concerns about children being in a vehicle with methamphetamine because children might intentionally or unintentionally consume the drug or be contaminated by the needle. Those involved in "that illicit narcotic culture" also tend to associate with "other unsavory characters," and it appeared to Officer Riggs that H.L.H. had been around people who were involved with methamphetamine.

Croy testified that A.H. was later picked up from school by Croy's co-worker and brought to the Department's office. When Croy told A.H. that he was being removed, he became very aggressive and upset to such an extent that the Department contacted MHMR to evaluate whether he needed to be hospitalized, but MHMR eventually cleared A.H. The children were then placed together in a foster home in Dallas, and the Department once again filed a petition for termination of Chad's parental rights to H.L.H. and Mia's parental rights to H.L.H. and A.H.

H.L.H. and A.H. were subsequently evaluated at a hospital on April 10, 2015. At that time, H.L.H. recounted two incidents of past sexual abuse, both of which had already

been reported before the first termination trial and neither of which involved Chad. H.L.H. also reported that she has had multiple psychiatric hospitalizations and that she set a psychiatric hospital on fire in November 2014. Finally, H.L.H. reported that she has used marijuana, methamphetamine, and heroin in the past. She stated that her last use of any drugs was in December 2014. A.H., on the other hand, denied ever being exposed to any drugs.

A sample of both H.L.H.'s and A.H.'s hair was taken to be tested for drugs. Croy stated that she believes that a hair-strand test screens for drugs ingested between two weeks and three months before the date the hair sample is collected. Torres said that the test would not detect drug ingestion within thirty days of the sample's collection. But when specifically asked again if drug ingestion within thirty days of the sample's collection could show up in the test results, Torres replied, "I guess it's possible." H.L.H.'s test results came back negative, but A.H. tested positive for methamphetamine despite his denial of being exposed to any drugs.

Croy testified that she received the drug-test results on April 15, 2015, and notified Torres and the county attorney's office. A.H.'s positive drug test caused the Department immediate serious concerns. When Croy was asked if she believes that a ten-year-old child has been endangered when he tests positive for methamphetamine, she responded, "Yes, definitely." Torres similarly stated that, because of the drug test, the Department believes that the parents knowingly placed A.H.'s physical and emotional well-being in danger or knowingly allowed A.H.'s physical and emotional well-being to be endangered and that the parents knowingly allowed their children to be placed with others who

endangered A.H.'s physical and emotional well-being.

On April 13, 2015, a full adversary hearing was held. Mia attended part of the hearing. Chad, however, did not attend the hearing even though he acknowledged that he had been served with the Department's petition and with a notice that the adversary hearing would be held on April 13. After the adversary hearing, the trial court signed an order naming the Department as H.L.H.'s and A.H.'s temporary managing conservator. Croy noted that this made the Department responsible for the children's placement and care. The trial court's order named Chad as temporary possessory conservator of H.L.H. and Mia as temporary possessory conservator of H.L.H. and A.H. and provided that Chad and Mia were to have no visitation with the children until further orders of the trial court.

Croy testified that, just a few days later on April 19, 2015, H.L.H. and A.H. ran away from their foster home. Torres stated that H.L.H. and A.H. contacted their parents, that the parents and children met up somewhere in Dallas, and that the parents fled with the children. Croy said that there were several accounts of how the runaway came about. The children's foster mother reported that H.L.H. called at least three people, including Ray on another foster child's cell phone, before the children ran away. It was also reported that H.L.H., A.H., and another foster child were outside walking the dog when "some man" picked up H.L.H. and A.H. in a van. Finally, there was a report that Chad and Mia picked up H.L.H. and A.H. near the foster home. Croy stated that she would have concerns if any of the foregoing accounts are true. Croy agreed that she would have concerns if Chad and Mia had gone and taken possession of the children from near the

foster home because it would be in direct violation of the trial court's order. Croy affirmed that she had never authorized Chad or Mia to take possession of the children after they were removed.

Torres testified that after the children ran away, she went to Ray's home and to different police departments while searching for them. Croy stated that she drafted an affidavit, requesting that the court issue a writ of attachment for both children. A writ of attachment for both children was signed on April 20, 2015, ordering any sheriff or constable to deliver the children safely into the Department's possession. Torres said that she then received a call early in the morning on April 22, 2015, that the children had been found. Croy stated that the Burleson Police Department found H.L.H. and A.H. with Chad and Mia at a house that Croy believes belongs to Chad's and Mia's friend.

Chad explained at trial that, on April 19, 2015, he was staying at his friend Amanda's house while Mia was staying at another friend's house down the street from there. Chad stated that he was not with Mia at that time because he and Mia disagreed about "the situation." He and Mia were also trying to stay out of Ray's home because it was their understanding that the Department was going to conduct a home study on Ray's home. At about 6 or 7 p.m. that evening, Chad received a call at Amanda's house from H.L.H. Chad does not know how H.L.H. got Amanda's phone number, but he acknowledged that Ray knew where he was staying and that Ray could have given H.L.H. the number. Chad asked H.L.H. from what phone she was calling, and H.L.H. replied that the phone belonged to one of the other children in the foster home.

Chad testified that H.L.H. told him that she and A.H. had run away and that they

had a friend in Abilene who was willing to let them go and stay there. Chad told H.L.H. that that was "absurd" and that she should not go to Abilene. H.L.H. then told Chad that their foster parents lived in the Oak Cliff area of Dallas, that the foster parents had been fighting and talking about splitting up, and that they were also discussing splitting up the children in the foster home. H.L.H. further told Chad that there was drug use in the foster home, that she and A.H. had used drugs in the home, and "something about Mexican sex trading." Chad asked H.L.H. if she had made any reports to anyone. H.L.H. told him that she had not; H.L.H. told him that they had just run away and were at a school playground close to the foster home. Chad told H.L.H. that he would come and get them. H.L.H. gave Chad an address for what she claimed was a friend's house close to the foster home. Chad told H.L.H. to give back the phone that she was using, to then go to the friend's house with A.H., and to wait for him there.

Chad testified that when he made the decision to go get the children, his intention had not been to commit a crime. He explained that after the first termination trial, he had made a promise to H.L.H. that he would be there "no matter what" if she ever called and needed him. And after H.L.H. called, he knew that H.L.H. and A.H. had run away from "a bad situation" and that they were on the streets in "a very bad neighborhood." He was therefore simply "saving [his] daughter from being on the streets." Chad further said that he did not know about the trial court's order precluding visitation with the children. However, he acknowledged that he knew that the Department had taken the children, and he admitted that he never asked the trial court for consent to take possession of the children. Chad eventually conceded that if the trial court had entered

an order stating that he was not allowed visitation with the children, then his picking up H.L.H. and A.H. was in direct violation of the order.

Chad testified that he was unable to leave for Dallas until about 9 p.m. After he had decided to go get the children, he asked Amanda if he could use her vehicle. She agreed as long as she could ride along. Chad then drove with Amanda to see another friend and to get some gas money before looking up the address that H.L.H. had given him and leaving for Dallas. Chad said that he then arrived in Dallas around 10:45 or 11:45 p.m. When he arrived at the address that H.L.H. had given him, Chad did not see the children, but when he started to drive away, H.L.H. and A.H. came running from the back of the house. H.L.H. and A.H. jumped into the vehicle, and H.L.H. immediately stated that A.H. had been molested. Chad told H.L.H. that they could talk about it later and drove them all back to Amanda's house.

Chad was cross-examined about why he did not call the police, who could have arrived immediately, instead of letting H.L.H. and A.H. roam the streets unsupervised in what he believed was a dangerous place. Chad said that he does not have any confidence in the police or the Department. Chad stated that if the police had found the children, they would have returned them to the Department's care. Instead, Chad wanted to get the children himself, take them to the police, and let the children tell the police about what had happened in the foster home. Chad hoped that the police would investigate, discover that the children had been in danger, and not return them to the same people. Chad nevertheless acknowledged that the children were alone on the streets of Dallas for a long time and that bad things could have happened.

Chad also acknowledged that he did not take H.L.H. to an emergency care provider after he picked her up even though she had told him that she had used drugs in the foster home. Chad explained that H.L.H. did not seem like she was under the influence of drugs or in need of healthcare at the time. Chad further stated that his intention had been to take the children to the police department the next day and to tell the police about the allegations that H.L.H. had made. Chad assumed that the police would take H.L.H. to a medical facility and conduct a drug test then.

Chad testified that he later talked "quite extensively" with H.L.H. about her drug use in the foster home and that H.L.H. told him that she had used methamphetamine in the foster home. Chad and H.L.H. also later talked about A.H. being sexually abused in the foster home. Chad stated that he did not talk to A.H. directly about it because A.H. seemed very upset and hesitant to speak about it. According to Chad, Mia talked to A.H. about it at some point, and Mia then told Chad that A.H. was "very distraught about it." Then again, Chad acknowledged at trial that H.L.H. may have made up the allegations regarding A.H. as a way to manipulate the situation. Chad also stated that he understood that A.H. later "withdrew" the allegations.

Chad testified that when they finally arrived at Amanda's house, the children wanted to see Mia. Chad was able to reach Mia around 6 or 7 a.m. on April 20, 2015, and told her that he needed to speak with her. Chad said that he did not tell her anything about the children at that time. Mia did not want to speak with Chad, but he eventually convinced her to let him come over. Chad went and picked up Mia while the children stayed at Amanda's house. According to Chad, Mia first encountered the children when

she went into Amanda's house, and the children were there to see her. When questioned about whether Mia ever subsequently attempted to call anyone to report that she had possession of H.L.H. and A.H., Chad explained that Mia did not have a phone. Chad also said that he sets the rules in his household and that he would not have let Mia call anyone.

When Mia was questioned at trial about how she came to pick up H.L.H. and A.H. from their foster home, she replied that H.L.H. had called. Mia stated that the children were in a "bad, bad area" for them to be out by themselves. H.L.H. and A.H. had said that A.H. had been hurt, that there was sex trafficking and drug use in the foster home, and that they were scared, missed their parents, and wanted to come home. Mia stated that she did what any parent who loved her children would have done and picked them up. She did not call the police. She said that she called their caseworker but received no return phone call. When asked if she called the CPS hotline, Mia replied, "No, but I did repeatedly call CPS. Nothing. Nothing. Nothing. Nothing."

Chad testified that after the children saw Mia, he then explained to the children his plan to take them to the police department and for them to tell the police what had happened in the foster home. But the children were upset and scared. The children did not want to go to the police because they knew that they would end up back in foster care. Chad then called Ray. Ray immediately told him that the Department, the Johnson County Task Force, and detectives had been to his house. Ray told Chad that an AMBER Alert had been issued for the children and that the authorities believed that Chad had taken the children and had violated his parole. Ray told Chad that if he had the children,

then he needed to contact the police. Chad told Ray that he did not have the children and hung up on him. The children then slept for several hours while Chad tried to gather his thoughts, figure out what to do, and make arrangements. Chad eventually decided not to take the children to the police. Chad explained that although he felt like he was doing the right thing, he now knew that he was being considered a criminal. He was therefore not going to go to the police without getting the children to "a safe place." Otherwise, the Department would immediately put the children "right back in a dangerous spot."

Chad testified that later in the afternoon on April 20, he, Mia, H.L.H., and A.H. went to another friend's house and spent the night there. They also spent the day and night of April 21, 2015, there. The children were able to bathe. Mia stayed with the children while Chad and the friend went to McDonald's and picked up lunch for everyone. They all then had pizza for dinner. Chad stated that, on April 22, 2015, he then tried to figure out what he needed to do regarding law enforcement because he was not trying to commit a crime and because he knew that he was not going to be able to continue what he was doing long term. Chad noted that none of the people with whom they had stayed had any real knowledge about what was happening.

Chad testified that, on April 22, a man whose name he does not remember gave them a ride to the man's home. The man's mother was at the home, and Chad briefly spoke to her and thanked both her and her son for giving them a ride. Chad does not know if the woman recognized the children, but he believes that his physical appearance intimidated her. The woman left the house, saying "that she was going to work or something," but she went to a neighbor's house and called the police. At about 6:30 a.m.

on April 22, the Burleson Police Department recovered the children and arrested Chad.

Torres testified that law enforcement transported H.L.H. and A.H. to the Department's office at that time and that she, Croy, and Amy Hughes, the family's conservatorship worker from April 2015 to December 2015, met them there. Hughes observed that both children appeared to be in poor condition. A.H. was dirty, he seemed to be very hungry, and his clothes were "very, very small for his size." Torres, Croy, and Hughes stated that A.H. did not appear to be under the influence of anything, but Torres said that A.H. was very upset and withdrawn and did not want to talk much; he felt like he could live on his own on the streets. Croy testified that she also had many concerns about H.L.H.'s condition. H.L.H. looked tired, her clothes were disheveled, and it appeared as though she had not bathed in a couple of days. Torres, Croy, and Hughes further said that H.L.H. seemed to be under the influence of something. Torres and Croy noted that H.L.H.'s eyes were extremely dilated and that she was biting her lip so hard that it was bleeding excessively. Torres commented that H.L.H. was exhibiting rapid mood swings and not making any sense. H.L.H. was "very hard to manage," and it took Torres a long time to calm her down so that she would not run or hurt herself.

Croy testified that she attempted to interview the children. H.L.H. was able to communicate, but she was regressing and acting like she was a little child. H.L.H. talked specifically about needing a car seat and a pacifier, and they eventually gave H.L.H. a pacifier so that she would stop biting her lip. The children were not very specific about where they had been, stating only "that they had gone all over." The children also talked about sleeping in a car a couple of times and eating only twice—McDonald's and pizza.

Croy acknowledged that she had concerns at that time that the children had once again been endangered by Chad's and Mia's actions.

Torres testified that they decided to take the children to the hospital to be examined. H.L.H.'s and A.H.'s medical records indicate that they were seen at the hospital at about 11:30 a.m. on April 22. A.H.'s physical exam revealed that he was "well developed, well nourished, well hydrated, non-toxic, [in] no apparent distress, vigorous, [and] smiling" at that time. He was given a urine drug screen that was negative. Similarly, H.L.H.'s physical exam indicated that she was "well developed, well nourished, well hydrated, non-toxic, [and in] no apparent distress." Her medical records further reveal that she showed "[n]o altered mental status, slurred speech, or signs of intoxication," and Torres agreed that H.L.H. was acting "less bizarre" by that time. H.L.H.'s urine drug screen, however, was positive for amphetamines and marijuana, and H.L.H.'s diagnosis was that she had used methamphetamine and marijuana. Torres and Croy testified that a urine drug screen detects amphetamine/methamphetamine use within seventy-two hours of the test. Torres said that she therefore believes that the drug-test results show that Chad's and Mia's actions or inaction knowingly or intentionally placed the children in an unsafe environment that endangered their physical and emotional well-being. Croy similarly stated that, based on the drug-test results, the Department definitely believes that H.L.H.'s physical and emotional well-being had been endangered.

Chad and Mia were thereafter each charged with two counts of interference with child custody, one count for each child. In light of A.H.'s positive hair-strand drug test

before the children ran away, Chad and Mia were also each charged with endangering a child. Both Chad and Mia were confined in jail at the time of the second termination trial, awaiting trial on these criminal charges. Chad testified that he had been jailed since his arrest on April 22; Mia stated that she had been detained since June 3, 2015.

During the second termination trial, Chad refuted the factual allegations underlying the endangering-a-child charge. Chad specifically denied having anything to do with A.H. testing positive for methamphetamine on the hair-strand drug test. Mia likewise stated, "I honestly have no idea how that even happened," when asked how she would explain A.H. testing positive for methamphetamine. When the children's attorney ad litem further asked Chad and Mia if it would surprise them to know that A.H. told her that he believes that he tested positive because Chad, Mia, and H.L.H. had used drugs around him, both Chad and Mia replied that it would surprise them.

Chad admitted that he has used methamphetamine in the past but stated that the last time that he had used drugs was before the first termination trial and that he had never used drugs while he had his children. Mia stated that she had been "clean" for many years and that she had had only a very short relapse on March 30, 2015, when the Department removed the children. Chad stated that he therefore does not believe that he or Mia is a drug addict. Chad also agreed that he believes that a child's use of an illegal substance is conduct that places the child in an unsafe or dangerous environment and that a child's use of a drug like methamphetamine poses imminent danger to him or her of death, bodily injury, and physical or mental impairment. Chad pointed out that A.H. had instead been in the possession of the Department and foster care before testing

positive for methamphetamine.

Chad also denied having anything to do with H.L.H. testing positive for drugs. He stated that he neither had drugs, used drugs, nor provided methamphetamine to H.L.H. during the time that the children were with him after running away. He further denied taking H.L.H. anywhere where she would have been around someone whom he knew used drugs. And although Chad did not check H.L.H. to see if she possessed drugs when he picked her up, he does not believe that H.L.H. used drugs while in his care. As for Mia, Croy testified that she attempted to have her take a hair-strand drug test after the children had been recovered but that Mia never completed it. Mia, like Chad, nevertheless stated that she was unaware of H.L.H. doing drugs during the three-day period when the children had run away. When Mia was asked how she would explain H.L.H. testing positive for methamphetamine, Mia replied, "I don't know that either as to why she would fail."

Chad claimed that H.L.H.'s positive drug test resulted from the children using methamphetamine in foster care. Chad supported this explanation by stating that the urine drug screen given to H.L.H. did not cover just the time that H.L.H. had been with him but that it also covered at least some of the time that H.L.H. had been in foster care. Chad said that he has "taken a lot of drug tests" and that his understanding is that a urine drug screen will detect methamphetamine use for at least the previous seven to ten days, depending on the amount of methamphetamine ingested. Chad explained that the more a person uses, the longer it will stay in his or her system. Chad further explained that marijuana is different than methamphetamine and can be detected in a urine drug screen

for up to thirty days.

Chad nevertheless acknowledged, when shown the photograph that was taken of H.L.H. at the Department's office after she had been recovered, that H.L.H. looked tired, exhausted, and in need of care. Chad stated that it is "a very disturbing picture" of H.L.H. Still, Chad insisted that H.L.H. had not looked or acted like that when she had been with him. He stated that H.L.H. had been very outspoken and vibrant. She had bathed and slept, and she was wearing clean clothes. Chad did not know why H.L.H. had regressed but rationalized that the photograph had been taken after H.L.H. had been in the Department's care for hours. Chad explained that H.L.H. has never enjoyed the Department; she has fought the Department and has told its employees lies. Chad claimed that the Department therefore caused H.L.H.'s appearance in the photograph because H.L.H. "had been up all morning probably having to talk to y'all for hours and upset, taken away from her parents."

Hughes testified that after H.L.H. had been returned to the Department's care on April 22, the Department placed H.L.H. in a shelter in downtown Fort Worth. H.L.H. then ran away again on April 28, 2015. Mia stated that H.L.H. called her after she had run away and that Mia began driving around, trying to find H.L.H. This time, however, Mia immediately called the police and reported H.L.H. as a runaway. Mia also informed the police that she had an ongoing CPS case and asked the police if she could pick up H.L.H. if she found her and if H.L.H. could stay with her until she was able to reach their caseworker. According to Mia, the police told her that she could pick up H.L.H. but that she needed to contact the Department immediately and let the caseworkers know that

she had possession of H.L.H. Mia eventually found H.L.H., picked her up, and returned her to the Department's office. Hughes confirmed that Mia returned H.L.H. to the Department on April 30, 2015, which Hughes acknowledged is what she would have wanted Mia to do. Mia told Hughes that H.L.H. had been in her possession for only a few hours, and Hughes noted that H.L.H. did not appear to be under the influence of anything at the time. H.L.H. was very emotional and did not want to leave Mia, but Mia eventually convinced H.L.H. that it was the right thing for H.L.H. to stay in the Department's care.

Hughes testified that she then prepared a service plan for the family, which was admitted into evidence. The service plan was filed with the district clerk and approved by the trial court in May 2015. Additionally, Hughes communicated directly with Chad and Mia about the service plan and believes that her communication with them was sufficient to let them know what was required of them. Hughes stated that, during her time as the family's conservatorship worker, however, neither Chad nor Mia participated in or completed any services through the Department and that she is unaware of Chad or Mia completing any services available to them in jail. Hughes acknowledged that the ability to complete services in jail is limited but stated that the jail generally offers opportunities to complete some services.

Mia responded that she did complete some of the service-plan requirements. Mia stated that, before she was confined in jail, she went to STAR Council, which Hughes described as a drug treatment facility available in Johnson County, and passed a urine drug screen. According to Mia, STAR Council then told her that she did not qualify for

their services at that time. Mia stated that she also completed the parenting class, the only service available to her in jail, in late September 2015. She was also taking a "Living Recovery Class," a Bible study based on twelve steps, which is optional to the Department. As for Chad, he testified that a service plan requiring him to complete certain services had been prepared and that he did not complete it. Chad explained that he had been unable to perform any services because he has been in jail where most of the required services are unavailable.

Hughes testified that while Chad and Mia were confined in jail, H.L.H. ran away from her placement on two more occasions. During questioning by Mia's attorney, Croy acknowledged that H.L.H. was not happy about being in foster care and that she wanted to run away. It was Croy's understanding, however, that H.L.H. and A.H. made statements that they were told to run away if the Department took possession of them, and it concerns Croy that parents would tell children to run away. Mia responded that she did not instruct her children to run from the Department, to disrupt their placements, or to be rude or disrespectful to Department personnel.

Hughes testified that because of the constant risk of H.L.H. running away, obtaining drugs, and making poor choices at the time of the second termination trial, H.L.H. could not be placed in a regular foster home. Torres stated that then fourteen-year-old H.L.H. was therefore living in a residential treatment center at the time of the second termination trial. Hughes explained that a residential treatment center is designed to rehabilitate a child through intensive therapy, counseling, and, in some cases, medication management so that the child can return to a less restrictive environment, like

a low-level residential treatment center or a foster home.

Torres, Hughes, Amy Conner, the family's conservatorship worker at the time of the second termination trial, and Patricia McCall, the CASA volunteer and guardian ad litem for the children, all testified that H.L.H. was doing well in the residential treatment center. Conner stated that when H.L.H. arrived at the residential treatment center, she required the highest level of care but that her level of care had been lowered one level. Additionally, H.L.H. was no longer on probation and no longer required medication, and she had been doing well in school and in therapy. Hughes stated that she believed that the residential treatment center was the appropriate type of facility for H.L.H. at the time of the second termination trial but that foster care would be an option in the future if H.L.H. demonstrates the ability to make good choices.

McCall testified that then eleven-year-old A.H. was also doing "pretty well" and living in a nice foster home where he was one of several foster children. His foster mother was very structured, and A.H. particularly liked his foster father. Conner stated that A.H. was also doing well in school and that his behaviors continued to improve but that he did still have some behavioral issues that required ongoing therapy.

A.H.'s counselor Steven Shepherd testified that he had been seeing A.H. weekly since September 2015. He uses a touch-and-praise process that he has developed called "trauma recovery therapy." Shepherd described it as a simple process that parents already do with their children. When a child exhibits a positive behavior, the parent touches the child and praises him or her, such as patting the child on the shoulder and saying "good job." The child then increases the positive behaviors because he or she

wants the positive attention.

Shepherd testified that he was seeing the benefits of therapy with A.H. but that he had also seen regressions in his behavior. According to Shepherd, A.H. tended to function like a seven- or eight-year-old in both his maturity and academic functioning. A.H. was also self-harming and continuing to struggle with acting out in public locations. A.H.'s foster mother told Shepherd that A.H. also had a long history of lying and making allegations of various abuses. A.H. confirmed to Shepherd that he had said things about the foster family or caseworkers that were not true. Shepherd explained that A.H. had made these false allegations for attention or to try to manipulate changes in his environment.

Shepherd testified that, based on his professional experience, he believes that A.H. has had some type of emotional trauma that has caused his behavioral issues. The psychological profile that Shepherd received also indicates that A.H. meets the standard for a stress-related, trauma-related disorder. Shepherd acknowledged that A.H. had experienced some recent traumatic situations, like being placed in foster care and running away from his foster home with H.L.H., but stated that, based on his experience, many of A.H.'s behaviors, emotional reactions, and perception distortions were consistent with children who have had trauma when they were younger, not older.

Shepherd noted that A.H. had discussed his parents during their sessions. A.H. told Shepherd that there was domestic violence, drug use, and a lot of chaos in the home, which made him feel unloved and insecure. Shepherd stated that a domestic-violence event is a frightening experience for a child and causes a child to experience a great deal

of distress, even if the violence is not aimed at the child. McCall further commented that A.H. loves Mia but is afraid of Chad. And when asked if A.H. ever reported that he had been harmed at home, McCall said, "He has stated something to that effect, not anything that is exact, but something to that effect, yes."

Shepherd testified that the environment A.H. came from was absolutely contrary to his best interest. Shepherd acknowledged that he had never met Chad or Mia and that he had not investigated A.H.'s statements but opined that, based on A.H.'s depiction of his parents and the home that he came from, it was not an appropriate place. Shepherd believes that the environment that A.H. came from endangered A.H.'s physical and emotional well-being and led A.H. to the perception that he is not worth being loved. Shepherd would have concerns about A.H.'s emotional well-being if A.H. were allowed to return to his parents' care. Shepherd opined that it is likely that A.H.'s emotional needs would not be met if he is returned to Chad and Mia and that his condition would worsen.

Shepherd testified that, on the other hand, A.H. was generally "doing well" and progressing in his foster home. The foster family had a structured environment, the foster mother was very proactive with the children, and the home was always suitable. A.H.'s behavior presents difficulties, but the foster family was willing to work through those issues with A.H.; therefore, A.H. was in a stable placement. Both Shepherd and Conner stated that they believe that A.H.'s needs were being met in his current placement. Shepherd acknowledged that he believes that A.H. loves his parents and misses his family, but both Shepherd and Hughes said that A.H. had indicated that adoption with a family that has good parenting skills but is young and active enough to have fun with

him would be a good placement for him. Shepherd and Hughes agreed.

Shepherd further testified that A.H. did not think that it was in his best interest to live with or have contact with H.L.H. at the time of the second termination trial. A.H. loves H.L.H. and would like to have contact with her later in life, but not presently. H.L.H. made him want to act out because they acted out together in the past. Hughes also stated that A.H. told her that he was fearful of H.L.H. and blamed her for the initial runaway. Based on what A.H. told her, Conner accordingly testified that although the Department's typical goal is to keep siblings together, she did not believe that it would be beneficial to H.L.H. and A.H. to stay together at that time.

As for H.L.H., she testified that she would very much like to return home to her parents and believed that it was in her best interest to do so. Hughes stated that she did not believe, however, that returning home was a good option for H.L.H. because H.L.H.'s pattern of running away and drug use would likely continue. McCall stated that H.L.H. had talked to her about the past drug use and that H.L.H. was "clean" at the time of the second termination trial and beginning to understand that drugs are not something that should be in her life. McCall also said while H.L.H. was very protective of Mia, McCall thought that H.L.H. was afraid of Chad.

Hughes testified that the permanency plan for the children was therefore unrelated adoption. In her opinion, Chad's and Mia's actions endangered the children, and Chad and Mia lack the willingness to work any services or to commit to make any changes for the betterment of their children and family. In her opinion, it was also in the children's best interest that Chad's and Mia's parental rights be terminated and that the

children be allowed to move forward with their permanency goals.

Conner testified that she had spoken with Mia and had no doubt that Mia loves and cares about H.L.H. and A.H. Conner had not had any contact with Chad, but believes that he also loves and cares for the children. Conner also agreed that Chad and Mia have very strong family support, and Hughes acknowledged that, considering H.L.H.'s behaviors, the likelihood of adoption for her would be low. Conner nevertheless believed that, given the circumstances and the case history, termination of Chad's and Mia's parental rights would be in the best interest of the children. McCall also stated that she believed that as much as the children love their parents, it is in their best interest "to stay in foster care so they can have a chance to overcome their issues and be productive young people."

Mia responded that she loves her children and believes that it is in the children's best interest to be with her and Chad. Mia stated that while she is confined in jail, there are multiple family members in both her and Chad's family who have expressed interest in taking the children. Ray confirmed that Chad and Mia have a lot of family support. Mia said that she eventually plans to start over with the children in another state. She does not believe that it would be hard for her to find employment and said that there are resources to help mothers and children. She commented that H.L.H. never got in trouble with the law while in her care and that A.H.'s behaviors in foster care were not the type of behavior that he has had while in her care. Chad similarly testified that he loves H.L.H. and would like for her to be returned to him and Mia. If not with them, he would at least like her to be placed with his immediate family. Chad agreed with Mia that they

ultimately plan to move out of state, and he believes that he would be able to find employment and provide housing for the family.

**Chad's Issue One**

In his first issue, Chad contends that the trial court erred in admitting evidence at the second termination trial of acts or omissions that occurred before the December 2014 order denying termination of his parental rights to H.L.H.

Section 161.004(a) of the Family Code, entitled "Termination of Parental Rights After Denial of Prior Petition to Terminate," states:

> The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:
>
> (1)  the petition under this section is filed after the date the order denying termination was rendered;
>
> (2)  the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;
>
> (3)  the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and
>
> (4)  termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.004(a) (West 2014). But section 161.004 does not provide the exclusive grounds for terminating a parent's parental rights to a child following entry of an order denying termination of the parent-child relationship after a prior termination proceeding. Termination can be achieved after a prior order denying termination of the parent-child relationship through either section 161.004 or section 161.001. *In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.—Fort Worth 2011, pet. denied); *see In re K.P.*, 498 S.W.3d 157,

170 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *In re D.N.*, 405 S.W.3d 863, 870 (Tex. App.—Amarillo 2013, no pet.). Using section 161.004 is nevertheless the only way that the trial court can terminate a parent's parental rights to a child based on evidence presented in a prior termination proceeding regarding the parent-child relationship. *See* TEX. FAM. CODE ANN. § 161.004(b); *K.P.*, 498 S.W.3d at 170; *D.N.*, 405 S.W.3d at 870; *K.G.*, 350 S.W.3d at 352.

The Department here sought to terminate Chad's parental rights to H.L.H. under section 161.001 only. The Department did not plead section 161.004 as a ground to terminate either Chad's or Mia's parental rights. The trial court therefore erred in admitting evidence of acts or omissions that occurred before the December 2014 order denying termination of Chad's parental rights to H.L.H. *See K.P.*, 498 S.W.3d at 170; *D.N.*, 405 S.W.3d at 870; *K.G.*, 350 S.W.3d at 352. Chad, however, has not preserved his complaint about the admission of such evidence. *See* TEX. R. APP. P. 33.1(a). Furthermore, the error in admitting such evidence is harmless to Chad because, as discussed below, the evidence of only the acts or omissions occurring after the December 2014 order denying termination of Chad's parental rights to H.L.H. is sufficient to support termination of Chad's parental rights to H.L.H. under section 161.001. *See, e.g.*, *K.G.*, 350 S.W.3d at 352. We therefore overrule Chad's first issue.

**Chad's Issues Two, Three, Four & Five**
**Mia's Issues One, Two, Three & Five**

In his second, third, fourth, and fifth issues, Chad contends that the evidence is legally and factually insufficient to support the findings that he violated Family Code

subsections 161.001(b)(1)(D), (E), and (O) and that termination of his parental rights to H.L.H. was in the child's best interest. In her first, second, third, and fifth issues, Mia contends that the evidence is legally and factually insufficient to support the findings that she violated Family Code subsections 161.001(b)(1)(D), (E), and (O), and that termination of her parental rights to H.L.H. and A.H. was in the children's best interest.[5]

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2017); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm

---

[5] Mia's fifth issue actually states that she contends that the evidence is only factually insufficient to support the finding that termination of her parental rights was in the children's best interest; however, Mia argues at least once in the substance of her argument that the evidence is also legally insufficient to support the finding that termination of her parental rights was in the children's best interest. We will therefore address both the legal and factual sufficiency of the best-interest finding as to Mia.

belief or conviction about the truth of the matter on which the petitioner bears the burden

of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency

review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to

evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

### *Statutory Predicate Grounds*

In his second and third issues and in her first and second issues, Chad and Mia,

respectively, contend that the evidence is legally and factually insufficient to establish

that he and she, respectively, violated Family Code subsections 161.001(b)(1)(D) and (E).

Termination under subsection 161.001(b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).
>
> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for

> danger to the children and disregarded that risk by … leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. [*In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)]; *see* TEX. FAM. CODE ANN. § 161.001[(b)](1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

Chad first argues that the evidence is legally and factually insufficient to establish that he violated subsection 161.001(b)(1)(D) because the Department focused on his and Mia's conduct and not the acceptability of the children's living conditions. Mia similarly notes in her brief that there were no allegations that her home was unsanitary or unkempt. However, as stated above, even though the focus of subsection 161.001(b)(1)(D) is on the child's environment, courts have held that parental conduct

itself may produce an endangering environment. *See J.T.G.*, 121 S.W.3d at 125 ("Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child."); *see also In re D.R.J.*, No. 07-08-0410-CV, 2009 WL 1953402, at *3 (Tex. App.—Amarillo Jul. 8, 2009, pet. denied) (mem. op.; "Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering 'environment.'").

Chad next argues that the evidence is legally and factually insufficient to establish that he violated subsection 161.001(b)(1)(E) because the removal of H.L.H. was based on the single incident of Mia being pulled over for a traffic stop and a syringe of methamphetamine being found in the vehicle. Chad notes that a single act or omission will not support the termination of parental rights under subsection 161.001(b)(1)(E) and points out that there is no evidence that he was the cause of H.L.H. being in Mia's vehicle that day. We, however, believe that the evidence supports that both Chad and Mia have engaged in a voluntary, deliberate, and conscious course of conduct that has endangered the physical and emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). And the evidence supports that both Chad's and Mia's conduct has produced an endangering environment that has endangered the physical and emotional well-being of the children. *See id.* § 161.001(b)(1)(D).

The evidence shows that, although Chad, Mia, and H.L.H. denied that there was domestic violence in the home, A.H. reported to school officials and to his counselor Shepherd that there was domestic violence in the home. Croy further testified that when she visited Ray's home unannounced, she encountered a disoriented Mia who had

scratches on her forehead and bruises on her arms.

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *see also Sylvia M. v. Dallas County Child Welfare Unit*, 771 S.W.2d 198, 201-04 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *K.A.S.*, 131 S.W.3d at 222; *see Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (violent or abusive conduct by someone within household is environment that endangers children).

Mia argues that A.H.'s alleged statements about domestic violence are not credible because the school officials themselves did not testify, because Shepherd uses "questionable methods of therapy," and because Shepherd also stated that A.H. lies to manipulate his environment. Mia further points out that she denied that her injuries were the result of domestic violence when Croy visited Ray's home unannounced. We, however, must defer to the jury's credibility determinations and reasonable resolution of factual disputes. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). From the evidence, the jury could have reasonably believed that there was domestic violence in the children's home.

The evidence also reveals that when Mia was pulled over for the traffic stop, it was discovered that a man who is a known drug user and gang member was in the vehicle

with her and H.L.H.  Although Mia denied knowing of its presence, a syringe of methamphetamine was also located under the passenger seat of the vehicle.  When Croy later met with Mia at the police station, she believed that Mia might be under the influence of drugs and therefore requested that Mia take an oral drug test, but Mia refused.  After the children were removed, A.H. then tested positive for methamphetamine, and, according to Shepherd, A.H. told him that there was drug use in the home.

A parent's illegal drug use and drug-related criminal activity may support a finding that the child's surroundings endanger his physical or emotional well-being.  *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied).  And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001[(b)](1)(E)." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195-96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child)).  A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs.  *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.).  A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.  *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.).

Mia argues that there is no testimony other than speculation as to where A.H. may have been exposed to drugs. Mia claims that the testimony was disputed regarding the "look back period" for a hair-strand drug test and that it is undisputed that she had no unsupervised contact with A.H. for the approximately ten days before the drug test was taken. The evidence, however, indicates that it is irrelevant who had possession of A.H. during the approximately ten days before the drug test was taken. The only testimony regarding the "look back period" for a hair-strand drug test was from Croy and Torres, who testified that the drug test screens for drugs ingested as recent as two weeks to thirty days before the hair sample is collected and as long as three months before the hair sample is collected. Chad and Mia had possession of A.H. during that time. Again, we must defer to the jury's credibility determinations and reasonable resolution of factual disputes. *See J.P.B.*, 180 S.W.3d at 573.

Moreover, in addition to A.H. testing positive for methamphetamine, H.L.H. tested positive for drugs after being in Chad's and Mia's possession for about three days. Chad and Mia again denied that there had been any drug use, but Torres and Croy testified that a urine drug screen detects amphetamine/methamphetamine use within only seventy-two hours of the test. Torres and Croy noted that soon after the children were recovered, H.L.H.'s eyes were extremely dilated, she was exhibiting rapid mood swings, she was biting her lip so hard that it was bleeding, and she was regressing and acting like a little child. Croy again attempted to have Mia take a hair-strand drug test after the children had been recovered, but Mia never completed it. Mia also acknowledged having a very short relapse on March 30, 2015, which was shortly before

the children ran away and ended up in Chad's and Mia's possession.

Finally, Chad acknowledged that he picked up H.L.H. and A.H. in direct violation of the trial court's order. Chad and Mia then continued to violate the trial court's order by spending several days with H.L.H. and A.H. At the time of the second termination trial, both Chad and Mia were therefore confined in jail, awaiting trial on the criminal charges that resulted from their actions.

A parent's engaging in criminal conduct endangers the emotional well-being of a child because of the parent's resulting incarceration. *See Karl v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-03-00655-CV, 2004 WL 1573162, at *3-4 (Tex. App.—Austin Jul. 15, 2004, no pet.) (mem. op.); *see also R.W.*, 129 S.W.3d at 739 ("[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

Mia argues that she did not go with Chad to pick up the children, she did not have a telephone to call authorities, and Chad stated that he would not have allowed her to call the authorities even if she had a telephone. But Mia testified to the contrary, stating that she did pick up H.L.H. and A.H. when they ran away and that she called their caseworker and received no return phone call.

Considering all the evidence in the light most favorable to the jury's findings and

considering the evidence as a whole, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Chad knowingly placed or knowingly allowed H.L.H. to remain in conditions or surroundings that endangered her physical or emotional well-being and that Chad engaged in conduct or knowingly placed H.L.H. with persons who engaged in conduct that endangered her physical or emotional well-being. Likewise, considering all the evidence in the light most favorable to the jury's findings and considering the evidence as a whole, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mia knowingly placed or knowingly allowed H.L.H. and A.H. to remain in conditions or surroundings that endangered their physical or emotional well-being and that Mia engaged in conduct or knowingly placed H.L.H. and A.H. with persons who engaged in conduct that endangered their physical or emotional well-being. We thus hold that the evidence is legally and factually sufficient to establish that Chad and Mia violated Family Code subsections 161.001(b)(1)(D) and (E). We overrule Chad's second and third issues and Mia's first and second issues.

In his fourth issue and in her third issue, Chad and Mia, respectively, contend that the evidence is legally and factually insufficient to establish that he and she, respectively, violated Family Code subsection 161.001(b)(1)(O). Having overruled Chad's second and third issues and Mia's first and second issues, however, we need not reach Chad's fourth issue and Mia's third issue. If multiple predicate violations under subsection 161.001(b)(1) were found in the trial court, we can affirm based on any one ground because only one predicate violation under subsection 161.001(b)(1) is necessary to a

termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

*Best Interest of the Children*

In his fifth issue, Chad contends that the evidence is legally and factually insufficient to support that termination of his parental rights to H.L.H. was in her best interest. In her fifth issue, Mia similarly contends that the evidence is legally and factually insufficient to support that termination of her parental rights to H.L.H. and A.H. was in the children's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* at 372. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree*, 907 S.W.2d at 86. The goal of establishing a stable, permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*,

728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

*The Desires of the Children*—H.L.H. would like to be returned to her family and believes that it would be in her best interest to be reunited with her family. Shepherd and Hughes testified that A.H. would like to be adopted by a young, active family.

Mia argues that we do not know the true desires of A.H. because he did not testify and because A.H. had been receiving counseling from Shepherd, whose testimony included "admitting" that he tries to redirect A.H.'s anger toward his parents. Shepherd actually testified that he is helping A.H. to stop blaming himself, which is the reason he self-harms, by helping A.H. shift the anger he feels back to the proper source, his parents, and *then learn to forgive them*. We must also defer to the jury's determinations on credibility issues, as long as those determinations are reasonable. *See J.P.B.*, 180 S.W.3d at 573. From the evidence, the jury could have reasonably believed that A.H. would prefer adoption by a young, active family to the return to Mia's care.

*The Emotional and Physical Needs of the Children Now and in the Future and the Emotional and Physical Danger to the Children Now and in the Future*—Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). Often, the best interest of the child is infused with the statutory offensive behavior. *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex.

App.—Fort Worth 2003, no pet.).  Particularly when the evidence shows that the parental relationship endangered the child's physical or emotional well-being, evidence of the parental misconduct leading to the removal and subsequent termination should be considered when reviewing the best interest of the child.  *In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *10 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.).  A parent's history, admissions, drug abuse, and inability to maintain a lifestyle free from arrests and incarcerations are relevant to the best-interest determination.  *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).

We have already held above that the evidence is legally and factually sufficient to establish that Chad knowingly placed or knowingly allowed H.L.H. to remain in conditions or surroundings that endangered her physical or emotional well-being and that Chad engaged in conduct or knowingly placed H.L.H. with persons who engaged in conduct that endangered her physical or emotional well-being.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).  Likewise, we have already held above that the evidence is legally and factually sufficient to establish that Mia knowingly placed or knowingly allowed H.L.H. and A.H. to remain in conditions or surroundings that endangered their physical or emotional well-being and that Mia engaged in conduct or knowingly placed H.L.H. and A.H. with persons who engaged in conduct that endangered their physical or emotional well-being.  *See id.*  The evidence of Chad's and Mia's endangering conduct supports an inference that because of their past actions, Chad's and Mia's future conduct will continue to pose a danger to the children's physical and emotional well-being.  *See, e.g., In re Z.I.A.R.*, No. 10-16-00039-CV, 2016 WL 4150691, at *5 (Tex. App.—Waco Aug. 3,

2016, no pet.) (mem. op.). Furthermore, Chad's and Mia's confinement in jail at the time of the second termination trial makes their future uncertain and is relevant to their ability to meet the children's present and future physical and emotional needs. *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.).

*The Parental Abilities of the Individuals Seeking Custody and the Programs Available to Assist These Individuals*—Chad explains that he was in jail at the time of the second termination trial where most of the required services are unavailable. Mia notes that she completed the parenting classes required by the service plan. She also points out that there was no evidence that before the removal on March 30, 2015, the children were dirty, malnourished, bruised, or injured in any way.

But there was evidence that after the children ran away from their foster home and were with Chad and Mia for about three days, the children appeared to be in poor condition. Hughes testified that A.H. was dirty and seemed to be very hungry. Croy testified that H.L.H. looked tired, her clothes were disheveled, and it appeared as though she had not bathed in a couple of days. H.L.H. also tested positive for drugs. Chad and Mia denied that there had been any drug use, but soon after the children were recovered, Torres and Croy noted that H.L.H.'s eyes were extremely dilated, she was exhibiting rapid mood swings, she was biting her lip so hard that it was bleeding, and she was regressing and acting like a little child.

In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *See D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no

writ), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 & n.39.  Therefore, the jury could have considered the foregoing evidence in determining that Chad and Mia have poor parenting abilities.

On the other hand, the evidence indicates that H.L.H.'s and A.H.'s needs were being met in their placements.  A.H. was receiving counseling with Shepherd at the time of the second termination trial.  H.L.H. was living in a residential treatment center where she could receive intensive therapy and counseling.  And there was no evidence presented regarding programs available to the parents after a return.

*The Plans for the Children by the Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*—The factfinder may compare the parent's and the Department's plans for the children and consider whether the plan and expectations of each party are realistic or weak and ill-defined.  *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption."  *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).  A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur.  *D.O.*, 851 S.W.2d at 358.  The goal of establishing a stable, permanent home for children is a

compelling state interest.  *Dupree*, 907 S.W.2d at 87.

The Department's plan for the children was termination of parental rights and unrelated adoption.  Chad and Mia wanted the children returned to them; however, they were confined in jail at the time of the second termination trial.

Chad argues that an incarcerated parent can provide a safe environment for a child through family members and that he and Mia have a lot of family support.  But the Department had not found a suitable familial placement for the children.  Both Chad and Mia also testified that when they were no longer confined in jail, they planned to move with the children to another state, presumably away from their family support.

*Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship Is Not a Proper One and Any Excuse for the Acts or Omissions of the Parent*—The evidence discussed above indicates that Chad's relationship with H.L.H. is not a proper one. Likewise, the evidence discussed above indicates that Mia's relationship with H.L.H. and A.H. is not a proper one.  Any excuses for Chad's or Mia's acts or omissions have been discussed above.

Considering all the evidence in the light most favorable to the jury's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Chad's parental rights was in H.L.H.'s best interest.  Likewise, considering all the evidence in the light most favorable to the jury's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Mia's parental rights was in H.L.H.'s and A.H.'s best interest.  We overrule both Chad's and Mia's fifth

issues.

## Mia's Issue Four

In her fourth issue, Mia contends that the application of Family Code subsection 161.001(b)(1)(O) violated her due-process and equal-protection rights because the services required under her service plan were unavailable to her during her involuntary confinement and the Department refused to make the services available to her, rendering it impossible for her to complete the service plan. The Department responds that Mia has failed to preserve her complaint. We agree.

It is well settled that challenges to the constitutionality of a statute may be waived. *In re R.B.*, 225 S.W.3d 798, 801 (Tex. App.—Fort Worth 2007, no pet.). In the absence of such a complaint in the trial court, we are without authority to consider it. *Id.*; *see* TEX. R. APP. P. 33.1(a). In this case, Mia did not raise a complaint in the trial court that subsection 161.001(b)(1)(O) violated her due-process or equal-protection rights. Mia has therefore failed to preserve her complaint for review, and we overrule her fourth issue.

## Chad's Issue Six

In his sixth issue, Chad contends that the trial court erred in denying the plea in intervention of his mother (alias Kay). It is well established that "[a]n appealing party 'may not complain of errors which do not injuriously affect him or which merely affect the rights of others.'" *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 150 (Tex. 1982) (quoting *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 92 (Tex. 1973)). Here, the trial

court's ruling in denying Kay's plea in intervention injuriously affected only Kay.[6] Because the trial court's ruling did not injuriously affect Chad, we hold that Chad lacks standing to raise this issue. *In re E.N.J.*, No. 06-15-00019-CV, 2015 WL 5917726, at *2 (Tex. App.—Texarkana Aug. 13, 2015, no pet.) (mem. op.); *In re R.T.M.*, No. 06-14-00063-CV, 2014 WL 6977778, at *5 (Tex. App.—Texarkana Dec. 4, 2014, no pet.) (mem. op.); *see also E.A. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.). We overrule Chad's sixth issue.

Based on the foregoing, we affirm the trial court's order of termination.



REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
      (Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed March 14, 2018
[CV06]

*     (Chief Justice Gray concurs in the Court's judgment to the extent it affirms the trial court's judgment. A separate opinion will not issue.)

---

[6] Kay filed a notice of appeal challenging the trial court's order denying her original verified petition in intervention; however, she did not file a brief. The Clerk of this Court notified Kay in a letter that, under Rules of Appellate Procedure 38.8(a)(1) and 42.3, the Court may dismiss her appeal for want of prosecution unless, within twenty-one days of the date of the letter, she filed with the Court a response showing grounds for continuing the appeal. *See* TEX. R. APP. P. 38.8(a)(1), 42.3(b). More than twenty-one days passed, and we received no response from Kay. Accordingly, we dismissed Kay's appeal for want of prosecution. *See* TEX. R. APP. P. 42.3(b).